IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| BEAR RIVER MUTUAL INSURANCE COMPANY,<br><br>Plaintiff,<br><br><br>vs.<br><br><br>FORD MOTOR COMPANY, a Michigan corporation,<br><br>Defendant. | MEMORANDUM DECISION & ORDER ON DEFENDANT'S RENEWED MOTION FOR SPOLIATION SANCTIONS<br><br><br><br><br><br>Case No. 2:12-CV-731<br>Judge Dee Benson |

This matter is before the Court on Defendant Ford Motor Company's ("Ford") Renewed Motion for Spoliation Sanctions (Dkt. No. 86), Defendant's Motion to Exclude Opinions of Jeff Morrill (Dkt. No. 80), and Defendant's Motion to Exclude Opinions of Tad Norris (Dkt. No. 81). At oral argument on the motions, Ford was represented by Clay A. Guise, Tracy H. Fowler and Paul W. Shakespear. Plaintiff Bear River Mutual Insurance Company ("Bear River") was represented by Eric Olsen and Sarah Marie Wade. At the conclusion of the hearing, the Court took the matter under advisement. Now, having further considered the law and facts relating to

1

the motions, the Court renders the following Memorandum Decision and Order.

## BACKGROUND

The facts of this case are generally undisputed and have been set forth in detail, for the most part, in the Court's prior Order on Defendant's Motion for Spoliation Sanctions. (Dkt. No. 35.) In sum, Plaintiff Bear River claims that the speed control deactivation switch (SCDS) in the 1994 Ford F-150 pickup truck owned by its insureds, Jeff and Julie Schoepf, was defective and caused a fire that spread from the truck to the Schoepf's house.[1] Bear River's claim is based on an investigation conducted by Bear River's expert, Tad Norris, a fire investigator with IC Specialty Services, who was assigned to inspect the scene and determine the origin of the fire. On behalf of Bear River, Mr. Norris inspected the scene and decided what evidence should be preserved without Ford's presence, consent or input. As part of that investigation, Mr. Norris removed the SCDS' hexport and electrical housing and claims that he sent both to another expert, Jeff Morrill, who requested an examination of the hexport. Mr. Morrill acknowledged receipt of the hexport, but claims he never received the electrical housing. Following Norris' inspection and investigation, the scene of the fire was destroyed. Additionally, Plaintiff lost the hexport before it could be inspected and tested by Ford, and Plaintiff lost the electrical housing before inspection and/or testing by anyone.

At the outset of this case, given Plaintiff's failure to include Ford in the scene inspection combined with Plaintiff's loss of critical evidence, Ford filed a Motion for Spoliation Sanctions, requesting dismissal of the case in its entirety. (Dkt. No. 20.) At that same time, the parties filed

---

[1]The Complaint was filed by Jeff and Julie Schoepf, but Bear River substituted in their place based on its subrogation rights pursuant to its insurance policy with the Schoepfs.

a "Joint Motion to Stay Discovery" in order to "conserve resources while the parties and Court address the viability of this case." (Dkt. No. 18.)

On August 12, 2014, following briefing and oral argument on Ford's Motion for Spoliation Sanctions, the Court entered an order that granted, in part, Ford's motion for spoliation sanctions. (Dkt. No. 35, Order on Defendant's Motion for Spoliation Sanctions.) The Court's Order recognized the culpability of Bear River and the resulting prejudice to Ford, but stopped short of dismissing this action based on the information that was then-known regarding Mr. Norris' scene inspection and the loss of the SCDS.

Over two years later, and following the completion of expert discovery, Ford filed the motion now before the court – a Renewed Motion for Spoliation Sanctions – once again requesting dismissal of the case. Bear River opposed the motion, arguing that Ford's "renewed" motion "proffers no substantial new evidence or arguments" and is therefore an improper motion to reconsider that should be denied. (Dkt. No. 98, Pl.'s Opp'n at 6, 11.) Ford acknowledges that its initial motion for spoliation sanctions generally identified the same issues – Bear River's failure to preserve the scene and the inadequate testing and subsequent loss of the hexport for the SCDS. However, Ford asserts that during the two and one-half years since Ford filed its initial motion the evidence relating to those issues has developed and significantly changed. According to Ford, these subsequent developments fundamentally alter the spoliation analysis and merit dismissal of the case.

**DISCUSSION**

Federal courts possess inherent powers necessary "to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." Chambers v. NASCO, Inc., 501 U.S. 32, 43 (1991). Among those inherent powers is "the ability to fashion an appropriate sanction." Id. at 44; see also Smith v. Northwest Fin. Acceptance Inc., 129 F.3d 1408, 1419 (10th Cir. 1997 ("[A] federal court possesses the authority to impose . . . sanctions under its inherent power to control and supervise its own proceedings."); Martinez v. Roscoe, 100 F.3d 121, 123 (10th Cir. 1996) (providing a district court's imposition of sanctions under its inherent power is reviewed for abuse of discretion).

"When deciding whether to sanction a party for the spoliation of evidence, courts have considered a variety of factors, two of which generally carry the most weight: (1) the degree of culpability of the party who lost or destroyed the evidence, and (2) the degree of actual prejudice to the other party." Jordan F. Miller Corp. v. Mid-Continent Aircraft Services, Inc., 139 F.3d 912, 1998 WL 68879 (10th Cir. 1998) (unpublished) (citing Schmid v. Milwaukee Elec. Tool Corp., 13 F.3d 76, 79 (3d Cir. 1994)); Dillon v. Nissan Motor Co., 986 F.2d 263, 67-68 (8th Cir. 1993); Vasquez-Corales v. Sea-Land Serv., Inc., 172 F.R.D. 10, 13-14 (D.P.R. 1997) (collecting cases). In applying this standard, the Court remains mindful that "a court should impose the least onerous sanction that will remedy the prejudice and, where applicable, punish the wrongdoer and deter future wrongdoing." Jordan F. Miller Corp., 139 F.3d 912, 1998 WL 68879, at *6. And "dismissal is usually appropriate only where a lesser sanction would not serve the interest of justice." Id. (quoting Meade v. Grubbs, 841 F.2d 1512, 1520 (10th Cir. 1988).

4

Nonetheless, dismissal as a sanction is clearly within the district court's discretion. See Chambers, 501 U.S. at 44 ("[O]utright dismissal of a lawsuit . . . is a particularly severe sanction, yet is within the court's discretion.").

In this case, Ford claims that since the initial motion to dismiss for spoliation sanctions, Bear River's experts have been deposed and their testimony has revealed new facts that alter the spoliation analysis, warranting dismissal. Specifically, Ford claims it has obtained new and significant information regarding: (1) Plaintiff's failure to follow National Fire Protection Association (NFPA) codes and standards resulting in a failure to properly document and preserve evidence at the scene, (2) the lack of reliability and conclusiveness of the SEM testing, and (3) the significance of the loss of the electrical housing. Having carefully reviewed Ford's renewed motion, the written submissions of the parties, and the arguments of counsel, the Court agrees.

**1. The Spoliation of the Scene**

Since Ford's initial motion and the Court's August 2014 Order, new evidence has been discovered regarding Mr. Norris' failure to follow proper procedures with regard to his investigation of the fire. National Fire Protection Association (NFPA) 921 is a scientific-based investigation standard which requires an investigator to identify and evaluate all potential causes of a fire. See NFPA 921, § 19.2. Although Mr. Norris purported to follow NFPA 921, discovery has revealed multiple times when Mr. Norris failed to meet his obligations.

For example, under NFPA 921, Mr. Norris had a duty to notify all parties of his investigation. See NFPA 921, § 15.2.8.2. During his first inspection of the Schoepf's garage,

Mr. Norris determined the area of origin was in the northwest corner. Because this "first inspection" revealed and/or identified other interested parties, consistent with his obligations under NFPA 921, Mr. Norris "preserved the scene" and "didn't do any destructive further examination at that time." (Dkt. No. 86-3, Norris Dep. at 73.) Mr. Norris knew that in order to proceed, a "joint inspection" was necessary and "potential parties needed to be put on notice and given an opportunity" to inspect the scene. (Norris Dep. at 73, 95.) Thereafter, Mr. Norris notified his client, Bear River, but otherwise did nothing to notify Ford or others of the second scene inspection. (Norris Dep. at 95-96.) When Ford did not appear for the second inspection, Mr. Norris did nothing to confirm whether Bear River had notified Ford and whether Ford wanted to inspect the scene. (Norris Dep. at 97-98.) Plaintiff's failure to notify Ford of the second inspection failed to comply with NFPA 921.

Then, during the second inspection, without Ford present, Mr. Norris failed to meet his obligations under NFPA 921 by failing to properly document the scene and identify and preserve evidence related to all potential causes of the fire. Because the scene was not properly documented, the total number of potential causes of the fire remains uncertain. As Ford points out, "evidence regarding specific potential causes associated with an electric receptacle were not preserved." (Dkt. No. 86-7, Colwell Dep. at 72, 106-07.) Although Mr. Norris identified a timer for the sprinkler system that was plugged into this "electric receptacle" as a potential cause of the fire, he failed to identify an electric fence that was plugged into the same receptacle. (Colwell Dep. at 78-79.) The air compressor that Mr. Norris identified as a potential cause of the fire was located on a shelf near the electric receptacle, but Mr. Norris did not preserve the male

6

plug blades from the electric fence, the sprinkler timer, or the air compressor. (Colwell Dep. at 106-07.) According to Ford's expert, "these blades would have helped determine whether or not they could have acted as an ignition source." (Colwell Dep. at 107.) Moreover, Bear River's opposition to Ford's motion acknowledges that an additional potential cause of the fire – an electric dog fence – was not known to Ford when it filed its initial motion. NFPA warns that the failure to fully analyze and excavate the fire scene "may lead to an incorrect analysis." NFPA 921, § 18.3.2.3.

Mr. Norris then compounded the prejudice caused by his failure to properly document and preserve evidence at the scene by also failing to take steps to notify Ford before the scene was demolished. Although NFPA does not require "infinite preservation of the fire scene," it provides:

> Once the scene has been documented by interested parties, and the relevant evidence and the relevant evidence removed, there is no reason to continue to preserve the scene. The decision as to when sufficient steps have been taken to allow the resumption of normal activities should be made by all interested parties known at the time.

NFPA 921, § 17.3.7. In this case, it is undisputed that Mr. Norris identified Ford as an "interested party" after his first inspection of the scene. Then, after the second inspection, Mr. Norris focused on the SCDS from the Ford F-150 as the cause of the fire. Mr. Norris was also aware that the scene, the vehicle, and the SCDS had not been "documented" by Ford as contemplated by NFPA 921, and yet he took no effort to involve Ford in the decision to determine if "sufficient steps ha[d] been taken" to allow the demolition of the scene and the permanent destruction of evidence of potential causes of the fire.

7

In sum, the court concludes that discovery in this case has provided new information regarding Mr. Norris's failure to comply with NFPA 921 in terms of identifying possible causes of the fire, preserving evidence regarding these causes, and involving interested parties such as Ford in these decisions. As a result, Ford has been severely prejudiced by Bear River's conduct and has been deprived the ability to assess all potential causes of the fire.

**2. The Spoliation of the Hexport**

Additionally, the Court finds that the prejudice to Ford resulting from the loss of the hexport is more significant than originally understood.

Back in 2014, the Court was informed that although Plaintiff had lost the hexport, prior to the loss, Plaintiff's expert, Mr. Morrill, had obtained a Scanning Electron Microscopy (SEM) analysis of the hexport. And, relying on the SEM data – which identified the presence of copper on the face of the hexport – Plaintiff's experts opined that there was an internal failure within the SCDS which caused the fire. (Dkt. No. 23-3, Ingersoll Aff. at ¶11.) Accordingly, Plaintiff asserted that the loss of the hexport was not particularly prejudicial to Ford "because the SCDS ha[d] already been scanned and hard data obtained from that scan [was] available to Ford." (Dkt. No. 23, Pl.'s Mem. In Opp'n at 12.) In other words, Plaintiff claimed that even though it had lost the hexport, there was minimal prejudice to Ford because the SEM data was available to both parties and it provided clear evidence regarding the fire.

However, expert discovery has shed new light on the extent to which Plaintiff's testing of the SCDS was inadequate and has revealed that the SEM data is not as reliable as Plaintiff initially suggested. For example, Mr. Morrill testified that the purpose of conducting the SEM

analysis was to identify the presence (or absence) of copper on the face of the hexport because in its "as-manufactured" condition the face of the hexport contains no copper. (Dkt. No. 23-2, Morrill Aff. ¶ 11.) Morrill stated that in his experience, "when an SCDS internally fails, copper is deposited on the face of the hexport." (Dkt. No. 23-2, Ex. 3, Letter from J. Morrill to Bear River.) Morrill defined a "failure" as an arcing of the SCDS's electrical contacts, which is necessary for a fire to start in the SCDS. (Dkt. No. 23-2, Morrill Aff. ¶ 12; Morrill Dep. at 94-95.) Thus, the SEM analysis assumes that if copper is on the face of the hexport then it must have come from the SCDS' electrical contacts.

Mr. Morrill admitted, however, that the face of the hexport was not cleaned before the SEM analysis was conducted. (Morrill Dep. at 50-51, 57-58.) And he admitted that the SEM data included various elements from unknown sources – presumably debris from the fire. (Morrill Dep. at 80-81.) Because debris was present on the face of the hexport when the SEM analysis was conducted, there is no way to know whether the copper identified in the SEM data was from debris or from the arcing of the SCDS' electrical contacts.

These limitations in the SEM analysis are compounded by the fact that when Morrill sent the hexport for analysis he did not request any elemental maps necessary to identify "copper morphology." (Morrill Dep. at 80-83, 86.) The absence of this data is significant because Mr. Morrill admits that if there was an arcing of the SCDS' electrical contacts he would expect to find copper morphology, i.e., some readily identifiable shape containing copper. (Morrill Dep. at 82.)

In sum, subsequent discovery has confirmed problems with the SEM analysis requested

by Mr. Morrill and the need for more thorough testing. However, this testing cannot occur because Plaintiff lost the hexport.

### 3. The Spoliation of the Electrical Housing

As explained in detail at oral argument, the SCDS contains two main components: (1) the metal hexport, and (2) the electrical housing that contains the SCDS' electrical contacts. At the time of Ford's initial spoliation motion, Plaintiff glossed over the loss of the electrical housing by focusing on the fact that prior to losing the hexport, Plaintiff obtained a SEM analysis of the hexport, which plaintiffs claimed was reliable evidence that the SCDS caused the fire. However, as explained above, discovery has shown that the SEM analysis is not as reliable as plaintiffs initially asserted.

Having determined that the SEM data is not as reliable as initially believed, the prejudice caused by Plaintiff's additional loss of the electrical housing is substantially increased. The electrical housing is significant because, as both parties acknowledge, analysis of the electrical housing could conclusively eliminate the SCDS as the cause of the fire. The experts on both sides agree that the SCDS' contacts must arc in order for a fire to start in the SCDS and an x-ray of the electrical housing would reveal arced contacts. Stated another way, if the electrical contacts in the electrical housing remained intact, then the SCDS could not have caused the fire. Unfortunately, however, Plaintiff lost the SCDS' electrical housing before *either party* had been able to conduct *any* testing.

During his August 17, 2011 inspection, Mr. Norris elected to preserve the SDCS' hexport and electrical housing, which Norris testified were placed into bags marked 42-7 (housing) and

42-8 (hexport). (Norris Dep. at 72-72, 153-55, 161-62.) On September 8, 2011, Norris sent the hexport and electrical housing of the SCDS to Mr. Morrill. (Norris Dep. Ex. 3 (letter confirming 42-7 and 42-8 were sent to Mr. Morrill).) Mr. Morrill testified that the SCDS came in a small box containing two zip lock bags, but he denied that the package contained the electrical housing for the SCDS. (Morrill Dep. at 16-18, 31-34, 42.) Morrill did not photograph or videotape what he received, so neither he nor Mr. Norris can explain when or how the electrical housing was lost.

Morrill concedes the significance of the electrical housing because, as he explains, the process that can lead to a fire at the SCDS necessarily requires leakage of brake fluid into the electrical housing and the formation of a path from the contacts in the housing, through the fluid, to the grounded hexport. (Morrill Dep. at 68-71.) Moreover, Morrill concedes that a fire cannot occur at an SCDS unless the contacts have arced and melted. (Morrill Dep. at 75-76, 94-95.) Accordingly, Morrill admitted that if he had received the electrical housing, a simple and quick x-ray would establish the condition of the contacts and could conclusively eliminate the SCDS as the cause of the fire. (Morrill Dep. at 35.)

In sum, Plaintiff concedes that taking an x-ray of the electrical housing is a standard and inexpensive procedure that could conclusively eliminate the SCDS as the cause of the fire. Yet the depositions of Plaintiff's experts show that very little, if any, attention was given to the documentation, preservation and analysis of this critical piece of evidence. Neither Mr. Norris nor Mr. Morrill can explain what happened to the electrical housing portion of the SCDS, and as a result of Plaintiff's failure to document and preserve the electrical housing, Ford has been

11

denied the opportunity to analyze evidence that could conclusively eliminate the SCDS, and therefore the Ford F-150, as the cause of the fire.

## **CONCLUSION**

The court finds that expert discovery has revealed new information regarding Bear River's failure to document, preserve and test critical evidence – information that was not available when Ford filed its initial motion for spoliation sanctions. The discovery in this case has also illuminated the carelessness and culpability of Plaintiff and Plaintiff's experts with regard to the destruction and loss of the most critical evidence in this case.

In light of this, the Court agrees with the following statement by Ford:

> At every turn – in arranging for inspections of the scene, in conducting those inspections, in making decisions regarding the preservation of evidence, in documenting the preserved evidence, in transmitting evidence, and in deciding what testing would (and would not) be performed – Bear River and its experts made conscious decisions and took, at best, reckless actions that have irreparably prejudiced Ford's defense of this case.

(Dkt. No. 109, Def.'s Reply at 10.) Consequently, the Court concludes that the spoliation of evidence in this case requires the dismissal of Bear River's claims. Ford's Renewed Motion to Dismiss for Spoliation Sanctions is GRANTED. This action is DISMISSED in its entirety. Defendant's Motions to Exclude the Opinions of Jeff Morrill and Tad Norris are MOOT.

Dated this 22nd day of May, 2017.

_____
Dee Benson
United States District Judge